NOTICE
Decision filed 11/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240791-U

NOS. 5-24-0791, 5-24-0792 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MICHAEL C. and BRICYEN C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | Nos. 22-JA-230, 22-JA-231 |
| | ) | |
| Amber B., | ) | Honorable |
| | ) | Martin T. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1   *Held*: The judgment of the circuit court terminating the respondent's parental rights is affirmed where the circuit court's findings that the respondent was unfit for failure to make reasonable progress towards the goal of the children returning home within the relevant nine-month periods were not against the manifest weight of the evidence. Nor was the circuit court's finding that it was in the best interest of Michael and Bricyen C. to terminate the respondent's parental rights against the manifest weight of the evidence.

¶ 2   The respondent, Amber B., appeals the order from the circuit court of Madison County, which found her unfit due to her failure to make reasonable progress. Respondent is also contesting the circuit court's order of June 6, 2024, which determined that it was in the best interest of her biological minor children, Michael and Bricyen C., to terminate the respondent's parental rights. Respondent raises two issues on appeal: (1) whether the circuit court erred in finding respondent

1

unfit and (2) whether the circuit court's termination of respondent's parental rights was in the best interest of Michael and Bricyen C. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This consolidated appeal involves two juvenile cases[1] from the circuit court of Madison County. The respondent, Amber B., is the mother in each case. Both cases began with the filing on August 16, 2021, of juvenile petitions alleging, *inter alia*, that Michael and Bricyen C. are neglected minors as defined by article II of the Juvenile Court Act of 1987, in that the minors were in an environment injurious to their welfare. That same day, the circuit court of Madison County issued protective orders, indicating that Michael C., who was born in July of 2019, and Bricyen C., who was born in December of 2021, were abused and neglected minors within the meaning of article II of the Juvenile Court Act of 1987. Both causes were set for a shelter care hearing on August 17, 2021. At the shelter care hearing on August 17, 2021, it was indicated that, around the time of the State's filing of its juvenile petitions, the respondent had an open case with the Illinois Department of Children and Family Services (DCFS) because there was previous domestic violence in the home between respondent and Michael C. (Father), the father of Michael and Bricyen C.

¶ 5      Additionally on August 17, 2021, the circuit court found probable cause for the filing of the State's juvenile petitions based on the following: (a) the respondent's untreated mental issues that impair her ability to adequately care for Michael and Bricyen C., (b) the respondent's lack of participation in psychiatric services, (c) the respondent's involvement in domestic violence, and

---

[1]The respondent appealed the circuit court of Madison County's order dated June 6, 2024, which determined it was in the best interest of her three biological minor children to terminate her parental rights. However, the respondent specifically appealed the circuit court's order as it applied to two of her three biological children. The respondent's motion to consolidate the cases involving Michael and Bricyen C. was granted in August of 2024.

(d) the respondent's failure to cooperate with family services. As a result, the circuit court determined that it was an immediate and urgent necessity to remove Michael and Bricyen C. from the respondent's care. Temporary custody was given to the DCFS guardianship administrator.

¶ 6    On October 4, 2021, an adjudicatory report was filed by DCFS. The adjudicatory report indicated that DCFS had received a report stating around or about the beginning of July 2021, Michael C. was left unsupervised in a living room. During this time, Michael C. pulled a TV cord, causing the TV to fall on him and pin him to the floor. The reporter noticed marks about the size of a handprint on Michael C.'s back and chest after the TV incident. It was reported that the respondent was excessively physically aggressive with Michael and Bricyen C., punching, kicking, and throwing things at them when frustrated. The reporter stated that the respondent would "beat the shit out of them like they were teenagers or adults." The reporter attributed the respondent's behavior to stress caused by a lack of cigarettes and marijuana.

¶ 7    Further, the reporter indicated that the respondent and her children were in a car accident. It was reported that Michael and Bricyen C. were not in car seats at the time of the car accident and Father had to catch Michael and Bricyen C. to prevent them from being ejected from the car window. Following the accident, the respondent reportedly took Michael and Bricyen C. to the hospital but left before they could be examined because she was hungry.

¶ 8    The reporter also informed DCFS that the respondent had been living with the reporter for 3-4 weeks and had not bathed Bricyen C. However, the reporter noted that they no longer live together, as Father had picked them up that day to take them back to his residence in Alton, Illinois. Shortly after they left for Alton, police arrived at the reporter's home due to an anonymous caller requesting a welfare check on the respondent.

3

¶ 9     On January 11, 2022,[2] an adjudicatory hearing was conducted, and the circuit court entered an adjudicatory order. The circuit court found the respondent to be unfit and unable to parent. Accordingly, Michael and Bricyen C. were adjudged neglected, and the terms and conditions concerning the temporary custody of Michael and Bricyen C. were ordered to remain. The respondent was admonished that if she failed to correct the conditions which required Michael and Bricyen C. to be in care by cooperating with the terms of her service plan and DCFS, she risked termination of her parental rights.

¶ 10    The next permanency hearing was held on May 17, 2022. At this time, respondent's parental compliance with DCFS service plans was rated unsatisfactory. Specifically, respondent was rated unsatisfactory because she was very inconsistent with counseling services. And at the time of the May 17, 2022, permanency hearing, the respondent stopped counseling services because respondent allegedly moved to Missouri. Moreover, it was indicated that respondent was prescribed psychotropic medications and would go days without taking them. Additionally, respondent was unsatisfactory because she did not have stable housing, in that she was "bouncing back and forth from family member to family member." Further, respondent was unsatisfactory because she failed to complete a parenting program. Finally, respondent was unsatisfactory because she failed to complete substance abuse, domestic violence, and anger management assessments. Based upon the foregoing, the circuit court found that placement of the minors outside of the home was still necessary. And again, the respondent was admonished that if she failed to correct the conditions which required Michael and Bricyen C. to be in care by cooperating

_____

[2]Respondent's case was continued on October 14, 2021, to November 16, 2021, because mother's attorney was out on medical leave. On November 16, 2021, the respondent's case was continued, for good cause, to January 11, 2022. On January 11, 2022, the respondent's case was continued to April 14, 2022. On April 14, 2022, the court filed an order continuing the respondent's case to May 17, 2022.

with the terms of her service plan and DCFS, she risked termination of her parental rights. The permanency hearing was continued to August 30, 2022.

¶ 11     At the August 30, 2022, permanency hearing, the respondent's parental compliance with the DCFS service plan was rated unsatisfactory. Respondent was rated unsatisfactory due to the respondent not completing a mental health intake assessment. In addition, the respondent had not finished the required assessments for anger management, domestic violence, or substance abuse assessment. Additionally, as the respondent's rating concerned stable housing, the respondent was rated unsatisfactory because the respondent was living with Father in Alton, Illinois.

¶ 12     DCFS filed a permanency report on December 15, 2022. At the time of the December 15, 2022, report, the respondent denied living with Father. However, DCFS reported the respondent to be present at the Father's home when Father had visitation. Additionally reported was the fact that Father and respondent would attend visitations together, but visits would end due to the respondent's erratic behavior. Further, on or about December 1, 2022, the respondent and Father were involved in a domestic dispute, and the respondent was arrested for domestic battery in Madison County.

¶ 13     On January 3, 2023, the court indicated, again, that the above-mentioned DCFS services required by the court and by the service plan were appropriate and reasonably calculated to facilitate the achievement of Michael and Bricyen C. returning home. The circuit court reaffirmed its previous finding that the respondent was unfit due to a failure to make reasonable progress and efforts because the respondent had yet to successfully complete all service plan tasks. Based upon the circuit court's indications and findings, the circuit court entered a permanency order changing the permanency goal. The appropriate permanency goal was then changed to substitute care pending the determination of termination of the respondent's parental rights.

5

¶ 14     On March 31, 2023, DCFS filed a permanency report noting that respondent was rated unsatisfactory because she failed to comply with DCFS services. By this time, the respondent had completed a mental health intake form to receive mental health services. However, respondent failed to follow up with mental health services. Additionally, the respondent had not completed the necessary anger management, domestic violence, or substance abuse assessments. Nor had the respondent found stable housing, in that the respondent was still living with Father.

¶ 15     On June 2, 2023, a permanency report was filed indicating that the children would be at an immediate risk of ongoing exposure to domestic violence should the parents continue any form of relationship. Otherwise, there was no notable difference between the March 31, 2023, and June 2, 2023, permanency reports.

¶ 16     On June 13, 2023, the circuit court entered a permanency order, again, indicating that the appropriate permanency goal was substitute care pending the determination of termination of the respondent's parental rights because the respondent had yet to make reasonable efforts or progress toward the return of Michael and Bricyen C. The circuit court, again, indicated that the services contained in the service plan were appropriate and reasonably calculated. And again, the respondent was admonished that if she failed to correct the conditions that required Michael and Bricyen C. to be in care by cooperating with the terms of her service plan and DCFS, she risked termination of her parental rights.

¶ 17     On August 10, 2023, a permanency report was filed stating that the respondent and Father had been together for nine years. Further, the permanency report stated that the respondent has a history of residing with Father, and their relationship had ongoing domestic violence. Moreover, it was believed by Father that Michael and Bricyen C. should have both parents present despite the immediate risk of ongoing exposure of domestic violence to the children.

6

¶ 18    Furthermore, it was reported that there had been a total of 10 police contacts in response to domestic disputes between Father and the respondent since the respondent became involved with DCFS. The most recent, at the time, was July 13, 2023. On July 13, 2023, the Alton Police Department responded to a domestic dispute between the respondent and Father. The respondent and Father were engaged in a verbal argument that stemmed from Father accusing the respondent of stealing his personal use cannabis. Father agreed to allow the respondent to gather her belongings and leave his residence. The respondent was advised she was not to return to the residence without Father's authorization.

¶ 19    Two additional domestic incidents were reported following the July 13, 2023, incident between the respondent and Father. Specifically, on August 31, 2023, the Alton Police Department responded to a domestic disturbance between the respondent and Father. Father reportedly called the police because he was having problems with the respondent because she refused to leave. Upon officer arrival, the respondent had left. And on September 5, 2023, it was reported that Alton police officers responded to an incident involving the respondent and Father because an anonymous caller reported the respondent and Father to be physically fighting at an intersection.

¶ 20    On October 10, 2023, the State filed its petition in each child's case seeking a finding of unfitness and termination of the parental rights of the respondent based upon the failure to make reasonable efforts to correct the condition that led to the removal of Michael and Bricyen C. during any nine-month period following the adjudication of neglect, specifically from January 11, 2022, through the date of filing the State's petition; failure to make reasonable progress toward the return home of Michael and Bricyen C. during the same period; and failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Michael and Bricyen C.

7

¶ 21    On May 23, 2024,[3] the circuit court conducted a fitness hearing. The respondent was absent; however, her attorney was present.

¶ 22    Kimberly Wilson was called to testify by the State. Wilson testified that she was employed by Brightpoint, a child welfare agency, as a foster care specialist. Her job duties as a foster care specialist consisted of creating service plans, assisting in starting plan services, and finding permanency for children. Wilson was assigned to the respondent's case in August of 2021.

¶ 23    At the time of her testimony, Wilson testified that Michael C., then 4, and Bricyen C., then 3, came into her care due to an open intact case involving the respondent and the father. Wilson became involved with the respondent due to a hotline call. Wilson testified that she prepared a service plan for the respondent in September 2021. The respondent's service plan consisted of mental health intake, domestic violence, anger management, and substance abuse assessments and recommendations, as well as a parenting education course.

¶ 24    Further, Wilson testified that the respondent was required to have stable housing as a part of her service plan. According to Wilson, stable housing is defined as "housing that is consistent." Wilson testified that at the time of her testimony, the respondent was residing in Alton, Illinois, at an undisclosed address. Wilson testified that the respondent had, at one point in time, lived with two individuals in Springfield, Illinois, at an undisclosed address. Wilson testified that respondent lived with Father, at multiple points in time, despite her recommendation that the respondent should not reside with him due to the numerous domestic calls made to Father's residence. Wilson testified that there had been continuing calls for domestic violence between Father and the

---

[3]Permanency hearings were set to occur March 19, 2024, and April 8, 2024. At each of the subsequent permanency hearings, respondent's conduct remained consistent and, therefore, unsatisfactory. The permanency goal, substitute care pending the determination of terminating the respondent's parental rights, remained while custody and guardianship of Michael and Bricyen C. remained with DCFS. On April 8, 2024, the respondent's case was continued for termination of parental rights proceedings.

respondent. Wilson testified that the most recent calls occurred in July and August of 2023 and that she was concerned for the respondent, because the respondent had not completed domestic violence counseling.

¶ 25    When the State asked Wilson if she could recommend that Michael and Bricyen C. be returned home while the respondent is living with Father, Wilson testified that she could not make such a recommendation because respondent had not yet completed the required conditions of her service plan. Regarding the conditions of the respondent's service plan, Wilson testified that the conditions of the respondent's service plan were reviewed and changed, if necessary, every six months. However, Wilson testified that the conditions of the respondent's service plan did not change due to the respondent's lack of engagement through the pendency of her case. Further, Wilson testified that because the respondent would not engage in services through the pendency of her case, Wilson did not recommend additional services to the respondent.

¶ 26    Furthermore, and because of the respondent's lack of engagement, Wilson testified that the respondent's efforts in correcting the conditions that brought Michael and Bricyen C. into care were, overall, unsatisfactory. Additionally, Wilson testified that the respondent had not made any progress towards correcting the conditions that brought Michael and Bricyen C. into care. Accordingly, Wilson opined the respondent to be unfit to care for her children.

¶ 27    On cross-examination by the respondent's attorney, Wilson confirmed that the respondent was aware of the fitness hearing, and that Wilson notified the respondent via text message. Wilson testified that the respondent replied to Wilson's text message, showing acknowledgment by thanking her. Additionally, Wilson testified that as to her knowledge, the respondent had all the necessary information to follow through with the recommended service plan. Specifically, Wilson

9

testified that respondent would call Wilson, and then respondent would "go MIA for a little while and then come back."

¶ 28    On cross-examination by Father's attorney, Wilson testified she asked the State to put the respondent's case in termination status on or around October 10, of 2023, due to the respondent's lack of engagement and compliance with services.

¶ 29    The circuit court then examined Wilson, and Wilson confirmed that she told the respondent and Father that they were not allowed to talk to each other.

¶ 30    The next witness called was Father by his attorney. The relevant testimony from Father regarding the respondent indicated that the respondent lived with Father in the past, but he could not recall the exact date. Father believed that date to be around the time the respondent received domestic charges against him. Father testified that after the domestic incident, he and the respondent stopped cohabitating. Father was asked on direct examination if he continues to communicate with the respondent. Father did not deny that he communicates with the respondent, but rather stated that he usually speaks to the respondent through her sister.

¶ 31    On cross-examination by the State, Father testified that he felt as though he and the respondent were "a toxic mix" due to the respondent's mental instability. Father testified that he gave up trying to help the respondent because he was told that the ongoing relationship with the respondent was detrimental to the return home of Michael and Bricyen C.

¶ 32    After the conclusion of Father's testimony, the respondent's attorney called Wilson back to the stand. During cross-examination, Wilson testified that she had met the respondent at Father's home a few times to give paperwork to the respondent, as well as bus passes and things alike.

¶ 33    The circuit court then examined Wilson. Wilson clarified for the circuit court that the Alton police were called to the shared residence of Father and the respondent due to domestic violence.

10

At closing arguments, the respondent's attorney stated, "I don't have much of an argument. My client is not here. I don't have any evidence to rebut what was presented to the Court." After hearing closing arguments and the evidence presented, the circuit court took the matter under advisement.

¶ 34 On May 28, 2024, the circuit court issued a written order stating it had found, by clear and convincing evidence, that the respondent was unfit to have Michael and Bricyen C, for the following reasons as outlined by in the Illinois Adoption Act (750 ILCS 50/1(D) (West 2022)): (1) the respondent had failed to make reasonable efforts to correct the conditions that were the basis for the removal of Michael and Bricyen C. from her during any nine-month period following the adjudication of neglect, specifically from January 11, 2022, through the date the State filed its petition, and (2) the respondent failed to make reasonable progress toward the return of Michael and Bricyen C. to the respondent during any nine-month period following the adjudication of neglect, specifically from January 11, 2022, through the date the State filed its petition. As a result, the circuit court set a best interest hearing to occur on June 6, 2024.

¶ 35 On June 6, 2024, the respondent's best interest hearing took place. The respondent's attorney began the respondent's best interest hearing by stating, on the record, that the respondent was not present. The circuit court noted, for the record, that it had held a fitness hearing and found the respondent unfit.

¶ 36 The State then called Wilson to the stand. Wilson testified that around January 13, 2024, Michael and Bricyen C. were placed in foster care. When Wilson was asked by the State to describe the visitation between the respondent and Michael and Bricyen C., Wilson testified that "when [the respondent] does visit, which she hasn't visited often, and I think the last visit was in March. She does do fairly well ***." Furthermore, Wilson testified that the respondent "might make two

11

visits and then she'll go MIA. That's kind of the consistency throughout the whole case." Therefore, it was Wilson's opinion that the respondent did not have a bond with Michael and Bricyen C. Specifically, Wilson opined that it would not be detrimental to Michael and Bricyen C. for respondent's parental rights to be terminated, because the respondent had not put forth the effort to "help herself, visit with the boys, call the boys when she does have the opportunity, as well. She just hasn't put in the effort to see them or be involved in their life."

¶ 37    The court subsequently asked the respondent's attorney if she had any questions for Wilson, at which point the respondent's attorney told the circuit court, verbatim, "I have no questions. I think it's in the best interest." Moreover, the respondent's attorney indicated that she did not have presentable evidence regarding the best interest portion of the respondent's hearing. Consequently, the circuit court found that the State had proved, by a preponderance of the evidence, that it was in the best interest of Michael and Bricyen C. and the public that all parental rights flowing to and through the respondent, regarding Michael and Bricyen C., be permanently terminated. The respondent timely appealed.

¶ 38                                    II. ANALYSIS

¶ 39    The respondent first argues that the circuit court erred when it found her unfit as to reasonable efforts. The respondent acknowledges that the circuit court heard the evidence presented at the adjudicatory hearing and found she failed to make reasonable efforts. However, the respondent contends that the circuit court's finding, as to reasonable efforts, is erroneous because the circuit court cannot make a finding on an allegation not pleaded. In support of this contention, the respondent sets forth the fact that the State's petition seeking to terminate her parental rights did not include the ground of reasonable efforts. Rather, the petition reiterates one ground, reasonable progress, twice.

12

¶ 40    The respondent also argues that the circuit court made an error in determining that she was unfit due to failing to make reasonable progress. The respondent contends the circuit court found she failed to make reasonable progress based on the testimony of Wilson. Such testimony, according to the respondent, shows she made reasonable progress because she made minimum measurable movement toward reunification. In support of this argument, respondent highlights specific testimony from Wilson. That is, Wilson's testimony as to the fact that respondent (1) completed a mental health assessment, (2) attended 6 of 10 drug tests, and (3) was positive for THC at low levels but tested negative for meth.

¶ 41    The State concedes that the only basis stated in its petition, which the trial court found to be proven, relates to the respondent's failure to make reasonable progress. Therefore, on appeal, the State focuses solely on the circuit court's finding regarding reasonable progress. The State claims that the respondent failed to make reasonable progress during any nine-month period between January 11, 2022, through October 10, 2023, pursuant to section 1(D)(m)(ii) of the Adoption Act. While the State acknowledges that the respondent completed mental health intake forms, the State argues that she did not engage in any additional services. It is on this basis that the State believes the circuit court's finding of unfitness must be affirmed.

¶ 42    As a preliminary matter, we note that the circuit court adjudicated Michael and Bricyen C. as neglected, in a dispositional order, on January 11, 2022. Additionally, we note that the State specifically pleaded the relevant nine-month period, under section 1(D)(m)(ii) of the Adoption Act, as January 11, 2022, through October 10, 2023. The plain language of the Act indicates "any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022).

13

¶ 43    Thus, the date following when Michael and Bricyen C. were adjudicated as neglected minors, and the day on which the relevant nine-month period began, was January 12, 2022. Correspondingly, the statutory nine-month period expired October 12, 2022. However, for the purposes of this appeal, this court will consider the State's pleaded time period, specifically that of January 12, 2022, through October 10, 2023, relevant because the record demonstrates that the parties proceeded as though the entire period was relevant. See *In re S.L.*, 2014 IL 115424.

¶ 44    This court recognizes that termination of parental rights proceedings involves fundamental liberty interests. *Id.* ¶ 24. Nevertheless, the proceedings are governed by the Code of Civil Procedure because they are civil in nature; and are, therefore, subject to forfeiture. *Id.* ¶ 17. Regarding forfeiture, courts in the State of Illinois have recognized that the forfeiture rule is relaxed when the State's termination petition fails to state a cause of action. *Id.* Further, the Illinois Supreme Court has held that the State's failure to specify the nine-month period on which it relied in seeking to terminate a mother's parental rights does not prejudice a mother when the State files the allegations to state a cause of action under the Adoption Act and informs a mother as to the nature of the neglect charge. *Id.* ¶ 20.

¶ 45    In this matter, the State alleged that respondent was unfit because respondent "failed to make reasonable progress toward the return of Michael and Bricyen C. during any nine-month period following the adjudication of neglect, specifically that of January 11, 2022, through [October 10, 2023]." Thus, the State set forth the specific statutory grounds upon which it based its allegation of unfitness and appraised the respondent that it sought to terminate her parental rights, in part based on her failure to make reasonable progress toward Michael and Bricyen C.'s

14

return during any nine-month period from January 11, 2022, forward.[4] Nor does respondent indicate any specific prejudice and harm to her because of the State's failure.

¶ 46    Thus, the State's failure to specify the nine-month period on which it relied in seeking to terminate the respondent's parental rights, for this appeal, is considered a mere defect in the termination notice. Further, because the respondent failed to raise the issue of specificity, it is forfeited.

¶ 47    With that said, we turn to the first question presented by the respondent. The respondent sets forth the issue of whether the circuit court erred in concluding that respondent failed to make reasonable progress, pursuant to section 1(D)(m) of the Adoption Act, and is therefore unfit.

¶ 48    In general, termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)); *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010).

¶ 49    The finding of unfitness in this appeal was based upon section 1(D)(m)(ii):

---

[4]As a general principle, the Illinois Supreme Court has indicated that when there are multiple nine-month periods from which the State could seek to prove unfitness, notifying the parent of the specific time frame allows for better defense preparation. *In re S.L.*, 2014 IL 115424, ¶ 24. In this case, while the State did not clearly specify either in the notice or at the hearing which period or periods were the basis for its unfitness allegation, the respondent does not claim that the absence of notice hindered her ability to prepare an adequate defense.

"(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on. The pleading shall be filed and served on the parties no later than 3 weeks before the date set by the court for closure of discovery, and the allegations in the pleading shall be treated as incorporated into the petition or motion. Failure of a respondent to file a written denial of the allegations in the pleading shall not be treated as an admission that the allegations are true." 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 50    " 'Reasonable progress' is an objective standard and is based upon the amount of progress as measured from the conditions existing at the time of removal." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 37. The circuit court may conclude that a parent has made reasonable progress when it can conclude that the minor child will be able to return to parental custody in the near future. *Id.*

16

Additionally, only evidence occurring during the relevant nine-month period specified in the petition or motion to terminate parental rights pursuant to section 1(D)(m)(ii) may be considered by the circuit court when determining whether reasonable progress was made. *In re J.L.*, 236 Ill. 2d at 341.

¶ 51 A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne* P., 215 Ill. 2d 340, 354 (2005).

¶ 52 "A reviewing court *** must not substitute its judgment for that of the [circuit] court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *In re B.B.*, 386 Ill. App. 3d 686, 698 (2008). For that reason, this court will not reweigh the evidence or reassess the credibility of Wilson. Regarding all its findings and conclusions, the circuit court was in the best position to make a credibility assessment of the testimony of Wilson in this case.

¶ 53 Equally important and relevant here, the Illinois Supreme Court has indicated that

" '[i]f a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of [the Adoption] Act, "failure to make reasonable progress toward the return of

17

the child to the parent" includes *** the parent's failure to *** fulfill *** her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d at 217 (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). Put otherwise,

"[when] compliance with DCFS service plans is [intertwined with] a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to *** fulfill the terms of that service plan." *Id.*

¶ 54    In the adjudicatory order filed on January 11, 2022, the circuit court found that Michael and Bricyen C. were in an environment injurious to their welfare because the respondent had untreated mental issues that impair her ability to care for Michael and Bricyen C. and the respondent engaged in domestic violence with Father. Additionally, in a preliminary order entered May 19, 2022, the court noted that the services contained in the respondent's service plan tasks were appropriate and reasonably calculated to facilitate the return home of Michael and Bricyen C. At the time of the May 19, 2022, preliminary order, the respondent had not successfully completed the requirements of her service plan. Moreover, it was noted that the respondent was living with Father and had been arrested for domestic battery. Consequently, the circuit court found that the respondent had not made reasonable progress toward the return home of Michael and Bricyen C.

¶ 55    Turning to the relevant evidence, the respondent urges us to look to Wilson's testimony as to the fact that respondent (1) completed a mental health assessment, (2) attended 6 of 10 drug tests, and (3) was positive for THC at low levels but tested negative for meth. While this is true,

the record demonstrates a failure by the respondent during any nine-month period, specifically that from January 12, 2022, to October 10, 2023, to comply with the terms of the service plan and participate in available services. We emphasize that the benchmark for measuring a parent's progress, with respect to subsequent termination of parental rights proceedings, under the section of the Adoption Act governing reasonable progress encompasses the parent's compliance with the service plan and the court's directives considering the condition that gave rise to the removal of Michael and Bricyen C. See *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Such a failure, therefore, establishes a basis for removal for failure to make reasonable progress. As set forth in the background, the respondent failed to follow through and complete the recommended services. Accordingly, we find that the State did present sufficient evidence to establish a finding of unfitness.

¶ 56    We will now address whether the circuit court's finding that terminating the respondent's parental right was in the best interest of Michael and Bricyen C. was made in error. The respondent only argues that the circuit court erred in finding she did not make reasonable progress. The respondent does not address the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)) which are required to be considered by the circuit court in making this determination. Rather, the respondent argues that the finding of unfitness would cause her grave detriment; and in turn, the circuit court erred in finding it in the best interest of Michael and Bricyen C. to terminate her parental rights. Because the respondent does not address the factors set forth in section 1-3(4.05) of the Juvenile Court Act, the State asserts that the respondent waived her argument as to the issue.

¶ 57    The State is correct in that the respondent has forfeited her argument on appeal as to the issue. See Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020) (argument shall contain citation to authorities and

19

the pages of the record relied on; "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 58    Forfeiture notwithstanding, we cannot find that the circuit court's determination that it was in the best interests of the children to terminate the respondent's rights was against the manifest weight of the evidence. Once a parent has been found unfit, all considerations, including the parent's rights, yield to the child's interest in a stable, loving home life. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 34.

¶ 59    Further, when considering whether termination of parental rights is in a child's best interests, the circuit court must consider several factors within the context of the child's age and development needs. *Id.* (citing 705 ILCS 405/1-3 (West 2016)). These include the following:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
>
> (ii) the child's sense of security;
>
> (iii) the child's sense of familiarity;
>
> (iv) continuity of affection for the child;
>
> (v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

The detrimental impact of a circuit court's finding of unfitness on a parent is not relevant when considering whether termination of parental rights is in a child's best interest.

¶ 60    Furthermore, "[w]hile all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). Other important factors include " 'the nature and length of the child's relationship with the present caretaker' and the effect that a change of placement would have upon the emotional and psychological well-being of the child." *Id.* (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)). In this matter, the circuit court indicated that it had considered all the evidence presented upon determination that it was in the best interests of Michael and Bricyen C. to terminate the respondent's rights. The circuit court is not required to articulate any specific rationale for its decision, and on review we may affirm the circuit court's decision without relying on any basis used by the circuit court. *Id.*

¶ 61    Nonetheless, DCFS emphasized that there would be an immediate risk of domestic violence exposure to Michael and Bricyen C. if the respondent and Father continued their relationship. Equally significant, permanency reports filed during the relevant time period, specifically that from January 12, 2022, through October 10, 2023, indicate that the respondent's

21

bond between Michael and Bricyen C. had changed. Furthermore, the permanency reports indicate that both Michael and Bricyen C. have developed strong connections with their foster parents, adjusted well to their foster placements, and are thriving in their new environment.

¶ 62   Accordingly, we find the circuit court's determination to terminate the respondent's parental rights was in the children's best interest and was not against the manifest weight of the evidence because a review of the record reveals that the circuit court had sufficient evidence to make its best interest determination as to Michael and Bricyen C.

¶ 63                                    III. CONCLUSION

¶ 64   Based on the foregoing reasons, we affirm the May 28, 2024, and the June 6, 2024, orders of the circuit court of Madison County.


¶ 65   Affirmed.